UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 09-11559-RWZ


GREEN MOUNTAIN REALTY CORP.

v.

JOHN S. LEONARD *et al.*


MEMORANDUM OF DECISION


September 6, 2013


ZOBEL, D.J.

Plaintiff Green Mountain Realty Corp. ("Green Mountain") wants to build a 140-foot cell phone tower in Milton, Massachusetts. It applied to the Milton Board of Appeals ("BOA") and the Milton Conservation Commission ("MCC") for the required regulatory approvals; however, the BOA and the MCC each denied permission for the project. Green Mountain then sued both local government bodies, along with their individual members. It claimed the BOA and the MCC had violated the federal Telecommunications Act of 1996 in two ways: because their decisions were not supported by substantial evidence, and because they had effectively prohibited the provision of wireless services in the area. Green Mountain also claimed the BOA and the MCC had violated state law by acting arbitrarily and capriciously.

I granted summary judgment to defendants on all Green Mountain's claims. Green Mountain Realty Corp. v. Leonard, Civil Action No. 09-11559, 2011 WL 1898239

(D. Mass. May 18, 2011). The First Circuit affirmed in part and reversed in part,

remanding for further consideration of Green Mountain's effective prohibition claims.

<u>Green Mountain Realty Corp. v. Leonard</u>, 688 F.3d 40 (1st Cir. 2012). The parties now

once again cross-move for summary judgment.

## I.    Background

Green Mountain builds, owns, and manages cell phone towers. It leases space

on its towers to wireless carriers, who mount antennae there to provide wireless

coverage.

In October 2008, Green Mountain took out a ten-year lease on a plot of land

("the Site") between Interstate 93 ("I-93") and its Exit 3 southbound on-ramp. The Site

is owned by the Commonwealth of Massachusetts, which awarded Green Mountain the

lease through its Division of Capital Asset Management and Maintenance. It comprises

a roughly triangular piece of unzoned land, about 2,700 square feet in size. The Site

already contains several existing structures owned by the Commonwealth and

administered by the Massachusetts Department of Transportation's Highway Division.

Those structures include a camera pole, another pole, a self-supporting tower with

antennae, a transformer, and an underground utility line. The two poles and the self-

supporting tower are each 25 feet tall.

The lease contemplated that Green Mountain would use the Site to construct a

new cell phone tower in the form of a 140-foot monopole. It requires Green Mountain to

make space on the proposed tower for a state highway camera, which apparently must

be placed at a height of 90 feet. Green Mountain obtained letters of intent from the

wireless carriers MetroPCS Communications, Inc. ("MetroPCS") and T-Mobile USA, Inc. ("T-Mobile USA") indicating that they would mount antennae on the proposed tower. Another wireless carrier, Verizon Communications Inc. ("Verizon"), also indicated interest in placing an antenna on the tower, but it did not sign any written letter of intent.

The Site is located within the boundaries of the Town of Milton. Green Mountain was therefore required to apply to two municipal entities for permission to build its tower: the BOA, which is responsible for Milton's zoning laws, and the MCC, which enforces state and local laws for the protection of wetlands. In Fall 2009, both the BOA and the MCC rejected Green Mountain's application.

The BOA's written decision denying Green Mountain permission to build the tower rested primarily on its aesthetic concerns. It noted that the tower would be "widely visible" from the Blue Hills Reservation, a local state park, and would "substantially detract from the views, vistas, and natural environment of the Reservation." Docket # 23 ®.) at BOA 1576. The BOA also found the proposed tower would have an adverse aesthetic effect on the local residential neighborhood, and mentioned the "almost unanimous public opposition" to the proposed tower at the board's public hearings. R. at BOA 1564.

The MCC's written decision recorded that Green Mountain's proposed construction would affect 4,612 square feet of riverfront area, see 310 Mass. Code Regs. § 10.58, and 109 square feet of bordering vegetated wetland, see 310 Mass. Code Regs. § 10.55. The project also fell largely within the 25-foot non-disturbance

3

zone established by the Town of Milton's Wetlands Bylaws, Section XI. See R. at

CONCOM 24. Although the MCC recognized the wetlands at issue had already been

degraded by the construction of I-93 and the Exit 3 ramps, it found that "if those

wetlands, which the applicant seeks to further alter, are already degraded, those

wetlands are in greater need of protection, rather than less." R. at CONCOM 125. The

MCC also noted the aesthetic drawbacks of the proposed tower. Throughout its

decision, it repeatedly criticized Green Mountain for failing to properly analyze other

construction options like using a different location or building a shorter tower. It

concluded that Green Mountain had failed to carry its burden to show there would be

"no significant adverse impact" on the interests the MCC was charged with protecting.

Id.

Green Mountain then filed suit in this court. It claimed that the BOA and the MCC

had violated the federal Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-104,

110 Stat. 56, by rejecting the proposed tower. Specifically, Green Mountain charged (1)

that the BOA and the MCC had not based their decisions on substantial evidence, as

required by 47 U.S.C. § 332(c)(7)(B)(iii); and (2) that the BOA and the MCC had

effectively prohibited the provision of personal wireless services in this area, contrary to

47 U.S.C. § 332(c)(7)(B)(i)(II). It also claimed they had violated state law by acting in

an arbitrary and capricious fashion. See Mass. Gen. Laws ch. 40A, § 17; Subaru of

N.E. v. Bd. of Appeals, 395 N.E.2d 880, 882 (Mass. App. Ct. 1979).

The parties cross-moved for summary judgment, and I entered summary

judgment for defendants on all counts. Green Mountain Realty Corp. v. Leonard, 2011

4

WL 1898239 at *2-5. The First Circuit affirmed in part and reversed in part; it affirmed the summary judgment for defendants on Green Mountain's substantial evidence claims and its state law claims, but remanded for further consideration of the effective prohibition claims. Green Mountain Realty Corp. v. Leonard, 688 F.3d at 55 n.10, 60-61. On remand, I allowed the parties to supplement the record with further evidence. They did so, and again cross-moved for summary judgment.

After this second round of summary judgment briefing was complete, MetroPCS and T-Mobile USA merged into T-Mobile US, Inc. ("T-Mobile US"). See Press Release, T-Mobile US, T-Mobile and MetroPCS Combination Complete (May 1, 2013), available at http://newsroom.t-mobile.com/phoenix.zhtml?c=251624&p=irol-newsArticle&ID =1813495. I therefore ordered both parties to submit supplemental briefing and, if necessary, documentary evidence on how this merger should affect the pending summary judgment motions. Both parties submitted further briefing and evidence, and the cross-motions are now ripe for decision.

## II.    Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must view the record in the light most favorable to the nonmovant and draw all justifiable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If the evidence presented would allow a reasonable jury to return a verdict for the nonmovant, summary judgment must be denied. Id. at 248. Where the parties cross-move for summary judgment, the court applies the same standard to each

motion. See Atl. Fish Spotters Ass'n v. Evans, 321 F.3d 220, 224 (1st Cir. 2003).

## III. Analysis

Green Mountain's effective prohibition claims arise under 47 U.S.C.

§ 332(c)(7)(B)(i)(II), which states: "The regulation of the placement, construction, and

modification of personal wireless service facilities by any State or local government or

instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the

provision of personal wireless services." Here, Green Mountain asserts that by rejecting

the proposed tower, the BOA and the MCC effectively prohibited the provision of

wireless services in the area. "When a carrier claims an individual denial is an effective

prohibition, virtually all circuits require courts to (1) find a 'significant gap' in coverage

exists in an area and (2) consider whether alternatives to the carrier's proposed

solution to that gap mean that there is no effective prohibition." Green Mountain, 688

F.3d at 57 (quoting Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 48 (1st

Cir. 2009)).

As to the first part of the test: Whether a significant gap exists depends on the

coverage provided by each individual carrier. "The fact that some carrier provides some

service to some consumers does not in itself mean that the town has not effectively

prohibited services to other consumers." Second Generation Props. v. Town of Pelham,

313 F.3d 620, 634 (1st Cir. 2002); see Omnipoint Holdings, 586 F.3d at 49. "[C]ourts

assessing whether a coverage gap is significant should consider, inter alia, the

physical size of the gap, the area in which there is a gap, the number of users the gap

affects, and whether all of the carrier's users in that area are similarly affected by the

6

gaps." Omnipoint Holdings, 586 F.3d at 49. A gap will only qualify as significant if it "is large enough in terms of physical size and number of users affected to amount to an effective prohibition, rather than being a mere, and statutorily permissible, dead spot." Second Generation, 313 F.3d at 631. After all, "[f]ederal regulations contemplate that areas enjoying adequate coverage will still include spots without reliable service." Id.; see Green Mountain, 688 F.3d at 57-58; see also 47 C.F.R. § 22.99 (defining dead spots as "[s]mall areas within a service area where the field strength is lower than the minimum level for reliable service.")

As to the second part of the test: A plaintiff can demonstrate effective prohibition by showing that "the absence of feasible alternatives to the proposed tower means that the denial of [its] application effectively prohibits all wireless service in the area." Green Mountain, 688 F.3d at 58; see also Omnipoint Holdings, 586 F.3d at 52-53 ("Ultimately the question is a practical inquiry into feasible, available alternatives."). The plaintiff then bears the burden of proving that it "'investigated thoroughly the possibility of other viable alternatives' before concluding no other feasible plan was available." Omnipoint Holdings, 586 F.3d at 52 (quoting VoiceStream Minneapolis, Inc. v. St. Croix Cnty., 342 F.3d 818, 835 (7th Cir. 2003)). In determining whether an alternative solution to the coverage gap is feasible, "[w]hat facts are relevant may vary with the case." Id. Potentially important factors in judging an alternative solution include whether it is technically efficient or at least technically adequate, whether its overall cost makes it economically feasible, whether local authorities would prefer the alternative solution, and whether local authorities are willing to cooperate on the alternative solution. See

id. at 52-53.

Alternatively, a plaintiff can satisfy the second part of the effective prohibition test by demonstrating that the local regulatory criteria are impossible for any proposal to meet. Second Generation, 313 F.3d at 630 (1st Cir. 2002). In that case, the plaintiff must bear the heavy burden of showing that the local administrative body would reject any future proposal the plaintiff might advance. Town of Amherst v. Omnipoint Commc'ns Enters., 173 F.3d 9, 14 (1st Cir. 1999).

Throughout this test, "[t]he carrier has the burden to show an effective prohibition has occurred." Omnipoint Holdings, 586 F.3d at 48. And the test remains the same where (as here) it is a developer, rather than a wireless carrier, who asserts an effective prohibition. Green Mountain, 688 F.3d at 57 n.13; Second Generation, 313 F.3d at 629 n.7.

### A.     Timing

As it turns out, this case hinges on a question of timing: Should an effective prohibition claim be evaluated on the facts that existed when the local authority made its decision, or on the facts that currently exist? As applied to this case: Should Green Mountain's effective prohibition claims be decided on the facts that existed in Fall 2009, when the BOA and the MCC rendered their decisions, or on the facts that exist today in fall 2013? To my knowledge, this timing issue has not yet been addressed by any published decision; the parties cite only a single unpublished district court case on the question.

Green Mountain argues it need only show that the boards' decisions constituted

an effective prohibition at the time they were issued. See MetroPCS v. City & Cnty. of S.F., 2006 WL 1699580, at *13 (N.D. Cal. June 16, 2006) (applying the Ninth Circuit's least intrusive means standard as of "the time in which the municipal or local government in question makes its final determination as to the merits of a permit application"). It points out that any other interpretation would create a constantly moving target; a plaintiff would have to constantly produce new evidence up to the very day of trial (or summary judgment) to show that no new developments had made the gap in coverage less significant or had produced new reasonable alternatives. Likewise, Green Mountain argues that a local decision effectively prohibiting the provision of wireless services must be immediately preempted by the TCA as soon as it issues, regardless of whether future developments alleviate the effects of the decision. Otherwise, local authorities would have an incentive to delay litigation over effective prohibition claims in the hope that changed circumstances will save otherwise preempted decisions. Cf. 47 U.S.C. § 332(c)(7)(B)(v) (providing for expedited judicial review of allegedly preempted local decisions).

Defendants, on the other hand, argue that Green Mountain can only prevail by showing that there is an effective prohibition of wireless services at present. They emphasize the First Circuit's instruction that an effective prohibition claim challenges the effect of the zoning decision, not the decisionmaking process itself. See Green Mountain, 688 F.3d at 59 n.14 ("[A]n effective prohibition claim asserts that the decision, even if supported by the evidence, has an impermissible effect . . . ."). They also note that the trial court may consider additional evidence beyond the

administrative record on an effective prohibition claim, see id., and so they conclude

there is no reason to limit that additional evidence to proving the state of affairs that

existed when the board made its decision.

Green Mountain's arguments are not without force. However, I conclude that

defendants' interpretation is the more natural approach to the statute as a whole. The

TCA seeks to preserve the zoning authority of local governments; it insists that subject

to certain exceptions, "nothing in this chapter shall limit or affect the authority of a State

or local government or instrumentality thereof over decisions regarding the placement,

construction, and modification of personal wireless service facilities." 47 U.S.C. §

332(c)(7)(A); see also Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d

14, 19 ("The [TCA] attempts, subject to five limitations, to preserve state and local

authority over the placement and construction of facilities."). The effective prohibition

provision is an exception to that general rule. It requires that local government

regulation must not "prohibit or have the effect of prohibiting the provision of personal

wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). This exception ensures that

consumers will be able to access personal wireless services, even if local authorities

are hostile to new wireless facilities. See Omnipoint Holdings, 586 F.3d at 51 n.9

(describing the tension between the needs of cell phone consumers and property

owners). The provision does not aim to punish local boards that make bad decisions; it

only aims to ensure adequate personal wireless services will become available

wherever necessary. Cf. Town of Amherst, 173 F.3d at 17 (describing the statute's

"balance of local autonomy subject to federal limitations" as a "refreshing experiment in

federalism" designed to develop "individual solutions best adapted to the needs and desires of particular communities").

If a local authority denies a zoning permit and so permanently prohibits wireless services in a particular area, then that zoning decision is clearly preempted by 47 U.S.C. § 332(c)(7)(B)(i)(II).  But if new technological developments or other changed circumstances allow consumers to obtain wireless services in that area despite the zoning decision, then the decision has not effectively prohibited the provision of wireless services. A court deciding an effective prohibition claim under the TCA should therefore look to whether the local authority's decision has the present effect of prohibiting wireless services in the affected area.

Any other interpretation would produce absurd results. Imagine, for instance, that there is a significant coverage gap in a particular town, and that the town denies a developer permission to build the only then-feasible tower that could serve the coverage gap. Now imagine that circumstances change—wireless technology improves, new sites become available, new towers are built, etc.—and the former coverage gap is completely filled. On Green Mountain's interpretation, the TCA would nevertheless insist that the developer must be permitted to build a wholly redundant tower, just because it was once necessary. That conclusion cannot be squared with the TCA's focus on preserving local regulatory authority whenever possible. If adequate wireless services are already available when the court renders its decision, or if reasonable alternatives now make it unnecessary to reverse the local authority's zoning decision, then "the heavy artillery of federal preemption is simply unwarranted." Second

Generation, 313 F.3d at 635.[1]

Applying that conclusion here, it is only necessary to consider the facts as they stand today in order to decide Green Mountain's effective prohibition claims. But today's facts are most easily understood by reference to the past. I therefore review the situation as it existed in Fall 2009, and evaluate Green Mountain's effective prohibition claims as they stood then, before deciding them as of the present day.

**B.      Fall 2009**

The BOA issued its written denial of Green Mountain's application on September 24, 2009; the MCC issued its written denial a few weeks later on October 9, 2009. At that point, both MetroPCS and T-Mobile USA had significant gaps in coverage around the Site, and Green Mountain's proposed tower was the only feasible option that could remedy the significant gap in MetroPCS coverage.

**1.      Significant Gap**

The undisputed evidence shows that as of Fall 2009, at least two carriers— MetroPCS and T-Mobile USA—had a significant gap in coverage around Exit 3 on I-93.[2]

---

[1] Recognizing this problem, Green Mountain argues that I should "decide the question of effective prohibition on the facts . . . as they existed in 2009," but should then "take into account new facts . . . to fashion an appropriate remedy." Docket # 84 at 2. But there is no remedial question here. Either the BOA's decision and the MCC's decision violate the TCA, in which case they are preempted, or they do not, in which case they are not. See Nat'l Tower, 297 F.3d at 24 (the "appropriate remedy" on an effective prohibition claim is either remanding plaintiff's application to the local authority, or enjoining the local authority to approve that application).

[2] In fact, Victor Drouin—the owner and president of Green Mountain— testified by affidavit in 2010 that he "kn[e]w of no wireless communications providers that have reliable wireless coverage" in this area. Docket # 68-1 (Drouin Aff. 2010), ¶ 19. Defendants have brought forward no evidence that other wireless carriers provided consistent coverage around the Site in Fall 2009. Still, Green Mountain cannot rely on Drouin's affidavit alone to demonstrate that other carriers had a significant coverage gap in the area. Cf. T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Supervisors, 672 F.3d 259, 269 (4th Cir. 2012)

### a.    MetroPCS

As of Fall 2009, before its merger with T-Mobile USA, MetroPCS considered a signal of -88 dBm sufficient to ensure reliable wireless service on its network.[3] See Docket # 31-7 (Johari Aff. 2010), ¶ 8 (stating that a signal level of -88 dBm "will allow metroPCS subscribers to obtain reliable cell phone coverage in their vehicles as well as in their houses"). That signal threshold appears to have been reasonable. See Omnipoint Holdings, 586 F.3d at 49 (holding that a district court may "consider[] the provider's defined level of acceptable service" to determine whether a significant gap exists, and finding that a -84 dBm threshold "was reasonable on its face").

Green Mountain has submitted a coverage map showing that as of 2010 (and so presumably as of Fall 2009), MetroPCS's signal fell below -88 dBm in an area along I-93 from just west of the Exit 3 southbound on-ramp to just east of the Exit 4 northbound on-ramp. The asserted gap in coverage ran for about a mile and a half east to west along I-93, and for about a half a mile north to south across the highway. It included a small residential neighborhood by Exit 3 along Blue Hill River Road, Eileen Road, and Silver Brook Road. See Johari Aff. 2010, fig.1. This section of I-93 was (and remains) heavily traveled, with some 160,000 to 170,000 vehicles passing along it every day. See Johari Aff. 2010, ¶ 10; Docket # 31-3 (Pl.'s Heffernan Dep.) at 120, 158. While Green Mountain has not submitted data showing how many MetroPCS users were

---

(carrier may not rest on declarations stating "very general conclusions").

[3] The strength of a wireless signal is measured in negative decibels per milliwatt ("dBM"). A more negative dBm measurement corresponds to a weaker signal; thus, a signal strength of -100 dBm is weaker than a signal strength of -80 dBm. Omnipoint Holdings, 586 F.3d at 41 n.1.

traveling in those vehicles in Fall 2009, the number of consumers affected was clearly

significant. See Michael J. De La Merced, T-Mobile Deal for MetroPCS Adds Pressure

on Sprint, N.Y. Times DealBook (Oct. 3, 2012, 8:26 PM), http://dealbook.nytimes.com

/2012/10/03/t-mobile-deal-for-metropcs-increases-pressure-on-sprint/ (indicating that

MetroPCS served about three percent of all wireless subscribers in the U.S. before its

merger with T-Mobile USA). In addition, any MetroPCS users traveling along I-93 would

have spent a substantial amount of time in the coverage gap. A car traveling this

stretch of I-93 at the speed limit, 55 miles per hour, would take about a minute and a

half to cross the coverage gap—more than enough time to noticeably interrupt any

ongoing call. In traffic, the gap would take even longer to cross. Given the size of the

area in which MetroPCS's signal strength fell below -88 dBm, the nature of the area (a

heavily-traveled road), and the number of vehicles passing through the gap on a daily

basis, Green Mountain has shown as a matter of law that a significant gap in MetroPCS

coverage existed in Fall 2009 around the Site. See Nat'l Tower v. Frey, 164 F. Supp.

2d 185, 188 n.1 (D. Mass. 2001) ("A two mile gap in coverage along two heavily

traveled state highways carrying 27,000 vehicles a day . . . is clearly 'significant,'

notwithstanding defendants' unexplained scepticism."), aff'd sub nom. Nat'l Tower v.

Plainville Zoning Bd. of Appeals, 297 F.3d 14 (1st Cir. 2002).

      **b.**      **T-Mobile USA**

      Green Mountain also contends that T-Mobile USA had a significant gap in

coverage in the same area in Fall 2009. T-Mobile USA used a signal strength threshold

of -84 dBm to determine the scope of its coverage, which again appears reasonable.

14

See Pl.'s Heffernan Dep. at 111; Omnipoint Holdings, 586 F.3d at 49. In addition, T-Mobile USA measured the strength of its coverage by its dropped-call rate, which it sought to keep below 2%. Pl.'s Heffernan Dep. at 159.

The record includes a map showing the areas where T-Mobile USA had a signal strength of -84 dBm or better at the time when the BOA and the MCC made their decisions. See Docket # 25-7 at 5. That map shows that T-Mobile USA's signal strength used to drop below -84 dBm in approximately the same area where the MetroPCS coverage gap is located—that is, along about a mile and a half of I-93 between Exit 3 and Exit 4. The T-Mobile USA coverage gap was centered slightly further west than the MetroPCS gap; its western edge lay about halfway between Exit 2 and Exit 3, while its eastern edge lay about halfway between the northbound off- and on-ramps at Exit 4. See id.; cf. Docket # 25-6 (Defs.' Heffernan Dep. at 168, 170-73.[4] The heart of the coverage gap stretched for about three-quarters of a mile, centered just where the proposed tower would be built. See Docket # 25-7 at 5; Defs.' Heffernan Dep. at 168.

As noted above, in Fall 2009, some 160,000 to 170,000 vehicles passed along this stretch of highway every day. The record does not show how many T-Mobile USA subscribers were in those vehicles, but again it is clear that the number of consumers affected was significant. See De La Merced, supra (indicating that T-Mobile USA

---

[4] I note that the marks labeled "Western Edge" and "Eastern Edge" on the coverage map in the record were made to indicate the eastern and western edge of the T-Mobile USA coverage that the proposed tower would provide. See Heffernan Dep. at 171-72. As the map shows, those marks also apparently correspond roughly to the area where T-Mobile USA's signal strength fell below -84 dBm, although it is somewhat difficult to make out the colored shading on the black-and-white map in the record. See Docket # 25-7 at 5; see also Defs.' Heffernan Dep. at 164-65 (explaining the color scheme used for the coverage map).

served about ten percent of all wireless subscribers in the U.S. before its merger with MetroPCS). A car traveling at the speed limit along I-93 would suffer signal strength lower than -84 dBm for about a minute and a half, or longer in traffic. Considering these facts—including the size of the gap, the nature of the area, and the number of vehicles passing through the gap—I conclude that as a matter of law there was a significant gap in T-Mobile USA coverage here in Fall 2009. See Nat'l Tower v. Frey, 164 F. Supp. 2d at 188 n.1; see also supra Part III.B.1.a.

### 2.    Feasible Alternatives

I now turn to whether there were any feasible alternatives available in Fall 2009, other than Green Mountain's proposed tower, that could have filled the significant coverage gaps identified. See Green Mountain, 688 F.3d at 58.

Green Mountain has submitted several affidavits to the effect that no other plan could have remedied the identified coverage gaps. See, e.g., Docket # 68 (Drouin Aff. March 2013), ¶ 19; Docket # 68-1 (Drouin Aff. 2010), ¶ 47; see also Docket # 31-1 (Cooke Aff.), ¶ 21. Based on those affidavits, Green Mountain argues that the BOA and the MCC effectively prohibited the provision of wireless services in the area by rejecting the only feasible means for providing such services.

Defendants have advanced two sets of alternative solutions that they argue might have been feasible. First, they contend that Green Mountain could have located the proposed tower at a different site. Second, they argue that Green Mountain could have used a shorter tower at the same site.

### a.    Alternative Locations

For alternative locations, defendants have put forward three sites where (they argue) Green Mountain could have built a tower to resolve the asserted coverage gaps. Those proposed sites are known as Locations 3, 4, and 5.[5]

### i.    Location 3

Location 3 sits on a triangle formed by I-93 and the Exit 3 southbound off-ramp. It lies about a third of a mile east of the Site. According to the coverage maps in the record, a tower at Location 3 would have filled the MetroPCS coverage gap to about the same extent as a tower at the Site. Compare R. at BOA 1534 (showing coverage from Location 3), with Johari Aff. 2010, fig. 2 (showing coverage from the Site).

However, there are a few problems with Location 3. First, because the Exit 3 on-ramps and off-ramps are not symmetrical, the area between I-93 and the Exit 3 southbound off-ramp (around Location 3) is significantly smaller than the area between I-93 and the Exit 3 southbound on-ramp (around the Site). Green Mountain's president, Victor Drouin, estimated that the buildable area at Location 3 was "somewhat less than a quarter of the size" available at the Site. Docket # 25-1 (Drouin Dep.) at 98. Drouin testified by affidavit that Location 3 was too small to provide access for the equipment and trucks necessary to build the proposed tower. See Drouin Aff. March 2013, ¶ 16; Drouin Aff. 2010, ¶ 33; see also Drouin Dep. at 101-102. Green Mountain has also submitted an affidavit to the same effect from Peter Cooke, a contractor who worked for

---

[5] Defendants formerly led with two other alternative sites, Locations 1 and 2. However, they no longer assert those alternative sites were feasible, since coverage from those sites apparently would not have remedied the MetroPCS gap.  Green Mountain has submitted a coverage map showing that Location 2 is too far west to have significantly affected the MetroPCS coverage gap, see R. at BOA 1532, and Location 1 is even further west.

Green Mountain in acquiring the Site. See Cooke Aff., ¶ 27. Defendants have submitted

no evidence to the contrary. They note that Green Mountain did not put forward a tower

design hosting fewer than five carriers, which would require less space on the ground

for equipment shelters. See Docket # 36-4, at 102-03. But the uncontroverted evidence

shows that no matter how many carriers would eventually be hosted on the proposed

tower, there was not enough room at Location 3 for the equipment and trucks needed

to build the tower in the first place. See Drouin Aff. March 2013, ¶ 16; Drouin Aff. 2010,

¶ 33; Cooke Aff., ¶ 27; Drouin Dep. at 101-102.[6]

Second, unlike the Site, Location 3 is not already connected to the necessary

utilities. See Drouin Aff. 2010, ¶ 33; Cooke Aff., ¶ 27. The affidavits Green Mountain

has submitted from Drouin and Cooke indicate that significant additional construction

would be required to run new utility lines to Location 3. See, e.g., Drouin Aff. 2010, ¶

23. Not only would that additional construction cause "substantial wetlands

disturbance," Cooke Aff., ¶ 27, but its cost would make the entire project economically

infeasible. Drouin Aff. March 2013, ¶ 16. Defendants do not contest that Location 3

lacks utilities; they only argue that Green Mountain has not proven that running utilities

to Location 3 would be economically infeasible. Of course, Green Mountain's case

would have been more persuasive if it had submitted a financial analysis showing why

the cost of new utilities lines would make the project economically infeasible. But even

without that analysis, Green Mountain's evidence is sufficient to show as a matter of

---

[6] Defendants also note an "Alternative Siting Analysis" that Green Mountain submitted to the BOA in which Location 3 is marked as a "Possible Site Location[]." R. at BOA 328. That map only shows that Location 3 is not excluded by wetlands, steep slopes, or a no curb cut area. It does not represent that Location 3 is large enough to construct the proposed tower.

law that Location 3 was not a feasible alternative in Fall 2009 because of its small size and its lack of utilities.[7]

I note that it is hard to imagine why either the BOA or the MCC would have preferred a tower at Location 3 to a tower at the Site. The two locations are only about a third of a mile apart; presumably, the aesthetic impact of the tower would have been about the same in either case. Certainly neither the BOA nor the MCC indicated that it would approve a workable tower at Location 3. See Omnipoint Holdings, 586 F.3d at 52-53 (in determining if an alternative solution is feasible, one factor is whether local authorities would prefer the alternative solution).

### ii.    Locations 4 and 5

Locations 4 and 5 are located near Exit 4. Location 4 lies between the northbound and southbound lanes of I-93, while Location 5 lies just north of the southbound lane. Both sites lie not in Milton, but in the neighboring town of Randolph.

Green Mountain argues first that these sites did not provide sufficient coverage to remedy the significant gap in MetroPCS coverage that existed in Fall 2009. However,

---

[7]Green Mountain has also noted several other difficulties with respect to Location 3. It cites the potential safety hazard caused by placing a new tower next to a highway off-ramp, where cars regularly exit at high speeds. See Drouin Aff. 2010, ¶ 33; Cooke Aff. ¶ 27. It also notes that most of the area around Location 3 contains steep slopes, potentially making construction difficult. Cf. R. at BOA 328 (showing steep slope areas). Finally, it notes that the Highway Division has not offered a lease on Location 3; based on informal conversations with members of that department, Green Mountain believes the Commonwealth would not allow a cell phone tower to be constructed there. See Drouin Aff. 2010, ¶ 32; Cooke Aff., ¶ 26.

These concerns are less persuasive than the size of the site and the lack of utilities. The record does not clearly explain Green Mountain's safety concerns about the highway off-ramp. The steep slopes simply decrease the buildable area of the site; that objection has already been noted. As for the Highway Division, Green Mountain never formally applied to lease Location 3; it cannot rest on hearsay and speculation about what the Highway Division might do if it did apply. Cf. T-Mobile Ne., 672 F.3d at 269 (cell phone carrier failed to establish that it lacked reasonable alternatives where it did not adequately pursue an alternative site on land controlled by the National Park Service).

Green Mountain's evidence does not support that argument. The coverage maps in the record show the areas that would have received a sufficient MetroPCS signal from a tower at Location 4 or a tower at Location 5; these maps show that with a tower at either site, full MetroPCS coverage would have been available along I-93 from Exit 3 to Exit 4, with scattered coverage along I-93 for about a quarter of a mile west of the Exit 3 southbound on-ramp. See R. at BOA 1356, 1358. But the coverage map for a tower at the proposed Site shows a similar quarter-mile of scattered MetroPCS coverage around the Exit 4 northbound on-ramp. See Johari Aff. 2010, fig. 2. The only apparent advantage in coverage from a tower at the Site, as opposed to a tower at Location 4 or Location 5, is that a tower at the Site would have provided MetroPCS service to the small residential neighborhood north of Exit 3. But Green Mountain has not attempted to explain why the failure to serve this neighborhood should be considered a significant gap in coverage. I therefore find Green Mountain has failed to present evidence from which a reasonable jury could conclude that a tower at Location 4 or Location 5 would have failed to remedy the asserted MetroPCS coverage gap.[8]

Next, Green Mountain argues it is only required to show that there were no feasible alternative sites for new towers in the Town of Milton; it contends it should not have to rule out alternative sites for new towers in other towns. In Second Generation, the First Circuit held that a court deciding an effective prohibition claim should look to whether existing towers in other towns could provide coverage. 313 F.3d at 632. But it specifically limited its holding to existing towers, noting it "would view very differently a

---

[8] Green Mountain has not presented any evidence to show that a tower at Locations 4 or 5 would have failed to remedy the asserted gap in T-Mobile USA coverage.

case in which a town attempted to deflect onto another jurisdiction the need to build new towers." Id. at 632 n.12. The First Circuit has not since squarely addressed whether a court analyzing the existence of reasonable alternatives should consider sites for new towers in other towns. Nevertheless, based on the language of the statute, it seems that a plaintiff bringing an effective prohibition claim based on an individual denial should be required to show that no reasonable alternative sites were available in any jurisdiction. After all, if Green Mountain could have easily obtained a permit and built a new tower in Randolph that would have filled the gap, then the decisions of the BOA and the MCC would not have effectively prohibited the provision of wireless services in this area. See T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Supervisors, 672 F.3d 259, 269 (4th Cir. 2012) (plaintiff failed to show there were no feasible alternatives because it failed to rule out an alternative site in a different jurisdiction).

Nevertheless, Green Mountain has shown as a matter of law that neither Location 4 nor Location 5 were available alternative sites in Fall 2009. It has submitted unrebutted affidavits from Drouin and Cooke stating that neither location has utilities available, meaning that a tower at either site would have been economically infeasible. See Drouin Aff. 2010, ¶¶ 34-35; Cooke Aff. ¶¶ 28-29.[9] Again, Green Mountain could

---

[9] Defendants note that a lease agreement for Location 5 formerly offered by the Highway Division would have required the lessee to install "the camera equipment described in Appendix B" at that location. Docket # 25-3 at 8. From this, defendants infer that there must already be utilities available at Location 5 to service the proposed camera. There are two problems with this argument. First, no camera equipment is described in the Appendix B of the lease that appears in the record. See id. at 20. Second, defendants have submitted no evidence showing that the utilities needed to run the proposed cell phone tower are the same ones required to run a highway camera. In sum, no reasonable jury could conclude from the present record, without impermissible speculation, that the necessary utilities were available at Location 5.

have made its case more convincing by presenting financial analyses showing that the

cost of running utilities to the alternative locations would have made towers there

economically infeasible; but its showing is sufficient here even without that more

detailed analysis. On this record, no reasonable jury could conclude that Location 4 or

Location 5 presented a feasible alternative for providing wireless service to this area.[10]

In sum, Green Mountain has presented evidence sufficient to show as a matter

of law that in Fall 2009, no feasible alternative location for a tower was available.

### b.   Alternative Heights

Defendants argue next that even if no alternative location was available, Green

Mountain could have built a cell tower shorter than 140 feet at the Site. Green

Mountain responds that a 140-foot tower was necessary to ensure adequate MetroPCS

coverage.[11] In support of that contention, Green Mountain has submitted an affidavit

from Kamal Johari, a radio frequency engineer for MetroPCS, indicating that a 140-foot

antenna height was "needed to satisfy [MetroPCS's] coverage requirements in this

vicinity." Johari 2013 Aff., ¶ 11. Testimony before the BOA also indicated that a 140-

---

[10]Green Mountain has also raised other problems with Locations 4 and 5. It asserts that wireless providers would not have been interested in placing antennae on a tower in either of these locations; that the Highway Division was not offering either site for lease; that both locations were closer to the Blue Hills Reservation and would have had a comparable aesthetic impact; that Location 4 is smaller than the Site and only accessible from I-93's high-speed lanes; and that Location 5 would require an access point from the breakdown lane and would require cutting down some trees. See Drouin Aff. 2010, ¶¶ 34-35; Cooke Aff. ¶¶ 28-29. The first two objections are somewhat unconvincing, because Green Mountain has not put any statements from the wireless providers or the Highway Division in the record. As for the remaining objections, it is not clear whether they would have been enough on their own to render Locations 4 and 5 infeasible alternatives; but they certainly did not make those locations any more feasible.

[11] Green Mountain has not indicated that a 140-foot tower was necessary to ensure adequate T-Mobile USA coverage in Fall 2009. In fact, the evidence shows the T-Mobile USA gap could have been remedied by an antenna placed at a substantially lower height; Green Mountain intended to place the T-Mobile USA antenna on the tower at a height of about 120 feet. See Defs.' Heffernan Dep. at 173-79; Docket # 84-2.

foot tower was necessary. <u>See</u> R. at BOA 1563; <u>see also</u> R. at BOA 299 (statement of radio frequency engineer Frantz Pierre); Docket # 31-4 (Pl.'s Johari Dep.) at 107-08. <u>But see</u> R. at BOA 117 (indicating that one hundred feet "would be the lowest mounting height that effectively fills the current coverage gap").

Defendants point out that Green Mountain has not submitted any maps showing what coverage a shorter tower would have provided. They also note that at his deposition in 2010, Johari indicated (1) that he had never run an analysis of what MetroPCS coverage a shorter tower would have provided, and (2) that the only such analysis that had been run was no longer available. Docket # 25-5 (Defs.' Johari Dep.) at 44-48. In the interests of completeness, Green Mountain should certainly have produced maps showing what areas would still have had sufficient MetroPCS coverage even with a shorter tower.[12] The burden remains on Green Mountain to prove that it "'investigated thoroughly the possibility of other viable alternatives' before concluding no other feasible plan was available." <u>Omnipoint Holdings</u>, 586 F.3d at 52 (quoting <u>VoiceStream Minneapolis</u>, 342 F.3d at 835); <u>see also</u> <u>Nat'l Tower</u>, 297 F.3d at 24 ("We doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower, simply to defend themselves from an easily made accusation in court that an individual denial of a permit amounts to an effective prohibition."). But although the question is close, I conclude that Green Mountain has

---

[12] Alternatively, Green Mountain could have presented coverage maps from a number of different carriers showing that they all had significant coverage gaps in the area, and then demonstrated that these carriers could not all be accommodated on a shorter tower. <u>Cf.</u> Drouin Aff. 2010, ¶ 19 (indicating multiple carriers had significant gaps in this area); R. at BOA 117 (indicating antennae must be placed approximately ten feet apart on the tower).

met its burden to show as a matter of law that a shorter tower would not have remedied the significant gap in MetroPCS coverage. MetroPCS's radio frequency engineers consistently testified that a 140-foot tower was necessary to satisfy MetroPCS's coverage requirements in the area, and there is no contrary expert evidence in the record. See Johari 2013 Aff., ¶ 11; R. at BOA 299, 1563; Pl.'s Johari Dep. at 107-08. A reasonable jury could not find from this evidence that as of Fall 2009, a shorter tower on the same site was a feasible alternative that could resolve the MetroPCS coverage gap.

### 3.    Summary

As described above, Green Mountain has shown as a matter of law that in Fall 2009, there were significant gaps in MetroPCS and T-Mobile USA coverage in the affected area, and no feasible alternative existed for resolving the MetroPCS coverage gap other than a 140-foot tower at the Site. If the effective prohibition analysis depended on the facts that existed when the BOA and the MCC made their decisions, then Green Mountain would be entitled to summary judgment against both boards.[13]

### C.    Present Day

In the four years since the BOA and the MCC rendered their decisions, the

---

[13] Green Mountain brought separate effective prohibition claims against the BOA and the MCC, and "either agency's decision could have independently been an effective prohibition." Green Mountain, 688 F.3d at 60 n.15. Nevertheless, the effective prohibition analysis above is "largely, or even entirely, overlapping" as to each agency. Id. The significant gap analysis is obviously identical for each agency; whether a significant gap in coverage exists does not depend on which agency is regulating it. The feasible alternatives analysis is also identical; the proposed alternatives either failed to solve the MetroPCS coverage gap or they were physically and/or economically impractical. Those facts do not depend on which agency's regulations are considered. The analysis above consequently does not "turn on the rationale for the denial of an application or the specific criteria relied on by the administrative bod[ies]." Id.

situation has changed somewhat. On the facts that exist today, the necessary wireless services could be provided by a shorter tower. The BOA and the MCC therefore did not effectively prohibit the provision of wireless services by rejecting Green Mountain's proposed 140-foot monopole.

### 1. Significant Gap

Both of Green Mountain's motions for summary judgment rested largely on the significant gap in MetroPCS coverage around the Site. In May 2013, however, MetroPCS and T-Mobile USA merged to form T-Mobile US; the new company then began migrating customers off of the former MetroPCS network and onto the former T-Mobile USA network (now the T-Mobile US network). See T-Mobile and MetroPCS Combination Complete, supra; Press Release, T-Mobile US, Migration of MetroPCS Customers to Nationwide 4G HSPA+ and LTE Network Ahead of Schedule (June 14, 2013) [hereinafter Migration of MetroPCS Customers], available at http://newsroom .t-mobile.com/phoenix.zhtml?c=251624&p=irol-newsArticle&ID=1829966; Docket # 83-1 at 36-37. As a result, the gap in coverage on the former MetroPCS network is no longer significant, as a matter of law, since all former MetroPCS customers will shortly be operating on the T-Mobile US network. See Migration of MetroPCS Customers, supra (indicating that all MetroPCS customers will have migrated to the T-Mobile US network by the end of 2015); Omnipoint Holdings, 586 F.3d at 49 (whether a gap is significant depends in part on the number of users affected); Second Generation, 313 F.3d at 631 (same).

The T-Mobile US network today is also somewhat different from the T-Mobile

USA network of Fall 2009. After the BOA and the MCC rendered their decisions, a new site known as Site 4BS1588B was integrated into the T-Mobile USA network around Milton. That site provides a signal level of at least -84 dBM from Exit 2 on I-93 up to about the western edge of Exit 3, and over the small residential neighborhood to the north of Exit 3. See Defs.' Heffernan Dep. at 35-36, 39-44; Docket # 25-7 at 9. Overlaying the coverage from the new site onto the previous coverage, it appears that there is still a gap of about a mile along I-93 (from the western edge of Exit 3 to the middle of Exit 4) where T-Mobile US's signal strength falls below -84 dBM. See Docket # 25-7 at 6, 9. Before the merger, T-Mobile USA recorded data indicating that the dropped call percentages from Site 4BS1588B range from 3.54% to 9.57%, implying that the new site has not fulfilled the network's present need for coverage in the area. See Pl.'s Heffernan Dep. at 114-16 & Ex. 9.[14]

It thus appears that the existing gap in T-Mobile US coverage where signal strength drops below -84 dBm runs for about a mile along I-93, from the western edge of Exit 3 to halfway between the northbound off- and on-ramps at Exit 4. Again, this is a stretch of heavily traveled highway along which some 160,000 to 170,000 vehicles pass every day. See Johari Aff. 2010, ¶ 10; Docket # 31-3 (Pl.'s Heffernan Dep.) at 120, 158. The record does not reveal how many T-Mobile US subscribers are in those

---

[14] The coverage maps and dropped call data submitted by Green Mountain dates back to 2010. However, Green Mountain has submitted a letter from T-Mobile US dated August 27, 2013 stating that T-Mobile US has "conducted a radio frequency analysis taking into account present network conditions in the surrounding area" and found that a new antenna was "needed to remedy [a] significant gap in reliable wireless service within T-Mobile's network." Docket # 84-6. Naturally, I do not rely on T-Mobile US's legal conclusion that the asserted gap is significant; but the letter nevertheless indicates that the gap that existed in 2010 has not since been remedied. Moreover, there is no evidence in the record to indicate that T-Mobile US's coverage in the area today is different than T-Mobile USA's coverage was in 2010.

vehicles, but the number is surely significant. <u>See</u> Sue Marek, <u>T-Mobile's Increased Ad Spend in 2012 Didn't Result in Market Share Gains</u>, FierceWireless (July 9, 2013), http://www .fiercewireless.com/story/t-mobiles-increased-ad-spend-2012-didnt-result-market-share -gains/2013-07-09 (indicating T-Mobile US serves about 11.6% of all wireless subscribers in the U.S.). A T-Mobile US subscriber in a car traveling at the speed limit along I-93 would lose reliable signal for about a minute, likely long enough to interrupt any ongoing call. Given the size of the gap, the nature of the area, the number of vehicles passing through the gap, and the dropped call data, I conclude Green Mountain has shown as a matter of law there is still a significant gap in T-Mobile US coverage around the proposed site. <u>Cf.</u> <u>supra</u> Part III.B.1.

## 2. Feasible Alternatives

As described above, Green Mountain has shown that no feasible alternatives other than its proposed 140-foot tower at the Site were available in Fall 2009. Based on the evidence in the record, it remains true today that there are no feasible alternative locations for the proposed tower. <u>See</u> Docket # 84-3 (Drouin Aff. Aug. 2013), ¶ 1 & Ex. A & B (reaffirming Victor Drouin's previous affidavits showing that no alternative locations were feasible). In particular, there is no evidence to indicate that the problems with the proposed alternative locations—the small size of Location 3, and the lack of utilities at Locations 3, 4, and 5—have been resolved. A reasonable jury could not conclude from the record evidence that any feasible locations other than the Site presently exist.

However, Green Mountain has failed to rule out the feasible alternative of locating a shorter tower at the Site. The record evidence indicates that a 140-foot tower was only required in Fall 2009 because MetroPCS needed its antenna placed at 140 feet. See Johari 2013 Aff., ¶ 11; R. at BOA 299, 1563; Pl.'s Johari Dep. at 107-08. According to Green Mountain's original plan, the T-Mobile USA antenna would have been placed at 120 feet, which was apparently high enough to resolve T-Mobile USA's coverage gap. See Defs.' Heffernan Dep. at 173-79; Docket # 84-2. T-Mobile US has since confirmed that its coverage gap could be remedied by a tower only 117 feet high. See Docket # 84-6. Because the proposed tower need no longer fill any MetroPCS coverage gap, a shorter tower (at least 117 feet tall) would provide a reasonable alternative that could fill the only significant coverage gap Green Mountain has identified.

That does not imply a shorter tower is necessarily a better solution. Although Green Mountain has only shown a significant coverage gap currently exists in the T-Mobile US network, it appears that other carriers may also have significant coverage gaps in this area. See Drouin Aff. 2010, ¶ 19; cf. Drouin Aff. Aug. 2013, ¶¶ 4-5 (indicating that Verizon and AT&T are also interested in placing antennae on the proposed tower). If so, the BOA and the MCC cannot prohibit any such carriers from providing wireless services to customers in the area. See  47 U.S.C. § 332(c)(7)(B)(i)(II); Second Generation, 313 F.3d at 634. Upon reflection, the BOA and the MCC might prefer to authorize a single, taller tower at the Site rather than being forced to accept a number of shorter towers. Cf. Town of Amherst, 173 F.3d at 14 n.5

28

("[S]horter towers would lessen or eliminate the possibility of co-location for other carriers who, absent co-location, might all need to build their own towers."). But that decision is not for this court to make; instead, it is "just what Congress has reserved to the town." Id. Considering the facts as they stand today, the BOA and the MCC did not effectively prohibit the provision of wireless services by rejecting Green Mountain's proposed 140-foot tower, because the existing significant gap in T-Mobile US coverage could be filled by a shorter tower at the Site.

### 3.   Impossible Criteria

Green Mountain argues that even if the BOA and MCC did not reject the only feasible alternative by denying its proposed 140-foot tower, the two boards will also reject any other alternative that Green Mountain puts forward. In other words, it argues that the BOA and the MCC have set "criteria which are impossible for any applicant to meet." Second Generation, 313 F.3d at 630. To prove that point, Green Mountain must show "not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, 173 F.3d at 14. Needless to say, Green Mountain's burden here "is a heavy one." Id.

Fairly read, the record indicates that both the BOA and the MCC showed some hostility to the idea of any tower at the Site. See R. at BOA 1564-66, 1570-71, 1574-76; R. at CONCOM 125-26. But "there is no showing of such fixed hostility . . . that one can conclude that further applications would be useless." Town of Amherst, 173 F.3d at 14. In particular, there is no evidence that the BOA and the MCC would not look more favorably on a shorter tower. Green Mountain has never presented to the BOA or the

MCC any proposal for a tower less than 140 feet tall. <u>See</u> Drouin Dep. at 163-64.

Moreover, the height of the tower played a fairly significant role in both boards'

decisions. The BOA's denial rested primarily on the negative aesthetic impact of the

proposed tower on the surrounding neighborhood and on the Blue Hills Reservation,

<u>see</u> R. at BOA 1574-76; the record indicates that negative aesthetic impact would be at

least somewhat diminished by decreasing the height of the proposed tower to 120 feet.

<u>See</u> Drouin Dep. at 161-62 ("[A]nything 120 feet or below is essentially shielded from

the residential areas."). Likewise, the MCC based its negative decision at least in part

on the height of the proposed tower. R. at CONCOM 125 ("[T]he height of the tower

was, and remains, an important factor for consideration.") Indeed, the MCC specifically

faulted Green Mountain for failing to provide data on the possible efficacy of a shorter

tower. R. at CONCOM 126. The present record simply would not permit a reasonable

jury to conclude that Green Mountain has carried its "heavy burden," <u>Town of Amherst</u>,

173 F.3d at 14, to show that both the BOA and the MCC would necessarily reject any

proposal for a shorter tower. <u>See</u> <u>id.</u> at 16 ("It is too early to give up on the Board.").

     At the same time, the evidence clearly indicates that Green Mountain has made

a good faith effort to "systematically search[] for solutions to the gap problem using

technologically reliable criteria and methodologies." <u>Omnipoint Holdings</u>, 586 F.3d at

53. The BOA and the MCC cannot "just sit back and deny all applications," nor can they

"exhaust applicants by requiring successive applications without giving any clue of

what will do the trick." <u>Town of Amherst</u>, 173 F.3d at 16-17. If the BOA or the MCC's

future actions were to demonstrate "an unwillingness to acknowledge a problem or to

permit the crafting of a solution," <u>Second Generation</u>, 313 F.3d at 635, then Green

Mountain might well be able to demonstrate the boards are so fixedly hostile to any

new tower that they have effectively prohibited the provision of wireless services in the

area.[15]

## IV.   Conclusion

As of the present day, there is a feasible alternative solution—namely, a shorter

tower at the Site—that would resolve the only existing significant coverage gap shown

in the record (namely, the T-Mobile US coverage gap). The BOA and the MCC

therefore did not effectively prohibit the provision of wireless services in this area by

rejecting Green Mountain's application. Defendants' renewed motion for summary

judgment is consequently ALLOWED, and Green Mountain's renewed motion for

summary judgment is DENIED. Judgment shall enter accordingly.


      <u>September 6, 2013</u>                         <u>/s/Rya W. Zobel</u>
           DATE                                 RYA W. ZOBEL
                                      UNITED STATES DISTRICT JUDGE

---

[15] Once again, the effective prohibition analysis above is "largely . . . overlapping" as to the BOA and the MCC. <u>Green Mountain</u>, 688 F.3d at 60 n.15. The analyses of whether there is a significant gap, whether an alternative location would be physically or economically feasible, and whether a shorter tower can provide sufficient coverage are the same as to both boards. The analysis only differs as to whether each board would necessarily reject a future proposal for a shorter tower. <u>Cf. id.</u> ("To say that there is a feasible alternative under one set of regulatory standards does not mean that there are also alternatives under differing standards."). As described, considering each board's previous decisions and conduct independently, I conclude that no reasonable jury could find either board would surely reject a proposal for a shorter tower.